**[Cite as *State v. Gary*, 2025-Ohio-851.]**

<br>

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | | JUDGES: |
| | : | | Hon. Robert G. Montgomery, P.J. |
| Plaintiff - Appellee | : | | Hon. Kevin W. Popham, J. |
| | : | | Hon. David M. Gormley, J. |
| -vs- | : | | |
| | : | | |
| SABRINA GARY, | : | | Case No. CT2024-0077 |
| | : | | |
| Defendant - Appellant | : | | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Muskingum County
Common Pleas Court, Case No.
CR2024-0088

JUDGMENT:      Affirmed

DATE OF JUDGMENT:      March 13, 2025

APPEARANCES:

For Plaintiff-Appellee      For Defendant-Appellant

JOSEPH A. PALMER      DARREN L. MEADE
Muskingum County Prosecutor      2602 Oakstone Drive
27 N. 5th St., Suite 201      Columbus, OH  43213
Zanesville, OH  43701

*Montgomery, J.*

**{¶1}** Defendant-Appellant Sabrina Gary appeals the decision of the Muskingum County Court of Common Pleas finding appellant guilty of endangering children and strangulation, and sentencing appellant to 30 months in prison with 66 days credit. For the reasons set forth below, we affirm the trial court.

## STATEMENT OF THE CASE

**{¶2}** On February 21, 2024, appellant was indicted on four counts: one count of felonious assault, two counts of endangering children (one felony and one misdemeanor), and one count of strangulation. The charges stemmed from an incident that occurred during the evening hours of December 27, 2023, between appellant and the minor child, A.M. – appellant's grandchild.[1]

**{¶3}** On April 19, 2024, Appellant and her counsel signed a waiver to a trial by jury and said waiver was filed with the Court. On April 25, 2024, a bench trial took place. The State's case included testimony from the following individuals: (1) Judy Kuntz, a caseworker for Muskingum County Adult and Child Protective Services ("agency"); (2) Roni Kuhn, a forensic interviewer at Brave Beginnings Muskingum County Child Advocacy Center (fka as Hero's Landing); (3) Amanda McClelland, a SANE nurse at Brave Beginnings; and (4) Detective Jeremy Archer.

**{¶4}** At the conclusion of the State's case, pursuant to Crim. R. 29, the defense moved to dismiss count one, count two, and count four. The Court agreed to dismiss

---

[1] Appellant's brief contains a statement of the case and the facts; the State agrees with appellant's statement and proceeds to address the assignments of error.

count one, for felonious assault, and overruled the defense's motion on the remaining counts. After appellant testified on her own behalf, defense counsel renewed its Rule 29 motion for the remaining counts of the indictment; the court denied same. The Court heard closing arguments from both parties and took the matter under advisement. On May 30, 2024, the Court issued "Findings and Conclusions" and found Appellant guilty of count two - endangering children in violation of R.C. 2919.22(A) and (E)(2)(c), a third-degree felony, and count three – strangulation in violation of R.C. 2903.18(B)(2), a third-degree felony.

{¶5} Thereafter, defense counsel requested that the court merge those counts for purposes of sentencing; the State agreed to merge and elected to proceed to sentencing on the strangulation. On June 17, 2024, a sentencing hearing took place and sentenced appellant to thirty (30) months, with 66 days credit for time served.

### STATEMENT OF FACTS RELATED TO CONVICTION

{¶6} On December 27, 2023, the agency received a report regarding a family in crisis. Appellant brought A.M. to the agency and wanted to surrender custody of her to the agency, stating that she could no longer handle the minor child. Appellant reported that A.M.'s behavior at home was out of control, involving lying, stealing, cheating, and using electronics against the rules. A.M. acknowledged this behavior and agreed that she gets into trouble for being disrespectful. A.M.'s father, a heroin addict, also lives in the home as does A.M.'s older brother.

{¶7} When A.M. and appellant arrived at the agency, caseworker Judy Kuntz ("Kuntz") reported that appellant was cussing and yelling at A.M. to the point where Kuntz demanded that appellant stop speaking to A.M. in that manner. Kuntz pleaded with

appellant to let the agency help the family and provide some resources rather than surrendering A.M.  Kuntz stated the agency would come to the home the next day to determine the exact issues and provide resources for the family.  A.M. and appellant left the agency; Kuntz testified she did *not* have any major concerns at the time for A.M.'s safety.

{¶8}  On December 28, 2023, Kuntz and another caseworker, Marlene Carroll ("Carroll") arrived at appellant's home.  Appellant invited them in, and they walked to the kitchen and sat at the table.  According to Kuntz's testimony, Appellant came into the kitchen and said, "I put my fucking hands on her last night, are you gonna take her with you now." Tr. at p. 27.  Kuntz got up from the table and went to talk to A.M.

{¶9}  A.M. reported to Kuntz that late in the evening, appellant and her husband were rearranging bedroom furniture, and when appellant came out of the room, she caught A.M. using appellant's phone - A.M. had previously gotten her phone taken away for misbehavior.  A.M. stated that she was using appellant's phone to "snap" a friend about the agency coming to the home because she was nervous about it.  Appellant started yelling at A.M., grabbed her by the hair and dragged her to A.M.'s room, pushed A.M. up against a wall and "put her hands on" A.M., and A.M. specifically reporting that appellant grabbed her by the throat.

{¶10} After the altercation with appellant, A.M. further reported to Kuntz that appellant dragged A.M. to her room and told her father to take her to a homeless shelter.  Her father told A.M. to pack a bag.  Soon thereafter, A.M.'s father made her sit in a corner, got a belt out of the closet, and began to beat A.M. with it numerous times.  As a result of

both incidents, A.M. reported a puffy face, red marks on her legs and elsewhere, a hoarse voice, and she threw up two times.

{¶11} After hearing this report, Kuntz determined that the agency would take temporary custody of A.M. for 30 days. Appellant's husband had legal custody and signed the temporary custody agreement. A.M. was placed at a Youth Center that same day. Kuntz took photographs of A.M. and observed several red marks on her body including red marks on the right side and front of her throat. See Tr. pages 38-39. See also State's exhibits 33, 34, and 34a.[2]

{¶12} During cross-examination by defense counsel, Kuntz acknowledged that in her professional experience as a Children Services worker, and a police officer before that, she never encountered victims of strangulation. As for A.M., she did not observe cuts, scrapes, or bruising on A.M.'s neck, and could not identify the red marks on A.M.'s neck as being in the shape of fingers or thumbs.

{¶13} On January 11, 2024, Roni Kuhn, a forensic interviewer, examined A.M. at Brave Beginnings. She recorded the interview and filed a written report. Ms. Kuhn testified that A.M. reported that Appellant held her against the wall with her hands on A.M.'s neck, slapped A.M. more than once, and then when Appellant let go, she fell to the floor and almost passed out. Tr. p. 73.

{¶14} On cross-examination Ms. Kuhn acknowledged (1) not observing any red marks on A.M.'s neck during the interview; (2) A.M. stating she was holding her breath

_____

[2] On January 23, 2024, Kuntz returned to the home after a report that A.M.'s father tested positive for cocaine and fentanyl on January 17, 2024. At that visit, the family signed an extension of temporary custody but refused to sign any case plan because they did not want A.M. returned to the home.

because she didn't want Appellant to see her cry; (3) A.M. did not mention the crucial fact about nearly losing consciousness the first two times she recounted the incident with Ms. Kuhn, and only mentioned it the third time around; and (4) A.M.'s vomiting could have been caused by other factors.

{¶15} The State's next witness was Amanda McClelland, a SANE nurse[3] at Brave Beginnings, who conducted a forensic examination of A.M. on January 11, 2024. Nurse McClelland testified that A.M. described the incident as she did to Ms. Kuhn. Tr. pp. 101-102. She testified that the "patient's back was up against the wall and she was facing her grandmother. She shows two hands on her upper neck, pushing in on the bottom of her chin. Then she demonstrates the same with a doll." Tr. p. 102. And she continues that A.M. felt like she was going to pass out and reported she threw up two times. Tr. pp. 102-105.

{¶16} Nurse McClelland further testified that based on her experience and training, "roughly 10 seconds" of pressure is needed before a person would feel like they may black out. Tr. pp. 102-103. On cross, Nurse McClelland acknowledged that when she examined A.M., A.M. did not have a hoarse voice, puffy face, marks on the neck, and no signs of recent nose bleeding. Tr. pp. 128-129.

{¶17} The State's final witness was Detective Jeremy Archer of the Muskingum County Sheriff's office. During his testimony, various portions of Archer's recorded interview with Appellant were played (State's Exhibit 44). Detective Archer recounted a portion of the recorded interview where Appellant stated, "I busted (A.M's) ass so those

---

[3] SANE stands for Sexual Assault Nurse Examiner. McClelland stated however that she does more than examine sexual assault victims, it's more of a "forensic nursing" of doing a physical exam through a medical lens but also collecting evidence.

two [meaning A.M.'s father and grandfather] didn't have to do it." Detective Archer testified that appellant admitted to grabbing A.M. by the back of her head but denied grabbing her by the neck. Tr. p. 142. Detective Archer also testified that A.M.'s brother appeared fine, and he wished to stay in the home.

{¶18} Appellant testified in her own defense. Tr. pp. 173-177. Appellant testified that A.M. had been throwing up earlier in the day, even before this incident. Appellant acknowledged A.M.'s version of events up to the point of putting her hands on A.M.'s neck. Instead, appellant testified she grabbed A.M.'s hair but did so only because A.M. turned to run from her. Appellant tried to grab A.M.'s shirt, but accidentally grabbed her hair. Appellant stated that A.M. acted as if she was going to hit Appellant, at which point Appellant dragged her by the arm into A.M.'s bedroom, grabbed her by the back of her head, and ordered A.M. to turn and keep her face in the corner. Appellant states that A.M. came out of the corner and approached Appellant with her fists up as if she was going to hit Appellant; Appellant put her hand out to stop her and said, "You don't want to go there again with me, little girl." Appellant denied putting her hands on A.M.'s throat or on the sides of her neck.

{¶19} As stated, after taking the matter under advisement and reviewing all the evidence, the trial court issued its findings and conclusions. The court found appellant guilty of counts two and three. The court found "beyond a reasonable doubt" that appellant endangered a child by creating a substantial risk to the health and safety of A.M. and violating a duty of care to her. Based on the medical records, evidence, and testimony, such violation resulted in serious physical harm to A.M. Similarly, and based on the same evidence, the court determined beyond a reasonable doubt that appellant

knowingly created a substantial risk of physical harm to A.M. by strangulation. Appellant was sentenced and timely filed the instant appeal.

## ASSIGNMENTS OF ERROR

{¶20} I. "THE FINDING OF SERIOUS PHYSICAL HARM OR THE SUBSTANTIAL RISK THEREOF WAS AGAINST THE SUFFICIENCY OF THE EVIDENCE AS WELL AS THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶21} II. THE TRIAL COURT'S FINDING THAT APPELLANT COMMITTED AN ACT OF STRANGLING A.M. BY HER NECK WAS AGAINST THE SUFFICIENCY OF THE EVIDENCE AND MANIFEST WEIGHT OF THE EVIDENCE."

## STANDARD OF REVIEW

{¶22} Sufficiency of the evidence was addressed by the Ohio Supreme Court in *State v. Worley,* 164 Ohio St.3d. 589, 2021-Ohio-2207:

The test for sufficiency of the evidence is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4, and following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). " 'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." R.C. 2901.05(E). A sufficiency-of-the-evidence challenge asks whether the evidence adduced at trial "is legally sufficient to support the jury verdict as a matter of law." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 219.

**{¶23}** Thus, a review of the constitutional sufficiency of evidence to support a criminal conviction requires a court of appeals to determine if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. A court of appeals will not disturb a verdict on sufficiency of evidence grounds unless reasonable minds could not reach the same conclusion reached by the trier-of-fact. *State v. Williams*, 2024-Ohio-5578, ¶ 49 (5th Dist.).

**{¶24}** Importantly, a verdict can be against the manifest weight of the evidence even though legally sufficient evidence supports it. *State v. Knuff*, 175 Ohio St.3d 82, 2024-Ohio-902, ¶¶ 86-88. Weight of the evidence addresses the evidence's effect of inducing belief. State v. *Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, ¶83. When a court of appeals reverses a judgment of a trial court as against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of conflicting testimony. *State v. Jordan*, 174 Ohio St.3d 347, 2023-Ohio-3800; *Thompkins* at 387; *Williams,* ¶ 60. The reviewing court must determine whether the jury clearly "lost its way and created such a manifest miscarriage of justice" that the conviction cannot stand, and a new trial must be ordered. *Id.*, quoting *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, ¶ 77 (citations omitted).

**{¶25}** In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact. *Eastley v. Volkman,* 132 Ohio St. 3d 328, 2012-Ohio-2179, ¶ 21; *In re Z.C.*, 173 Ohio St.3d 359, 2023-Ohio-4703, ¶ 14. "The underlying rationale of giving deference to the findings of the trial court rests with the

knowledge that the [trier of fact] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

## ANALYSIS

{¶26} Appellant's first and second assignments of error both involve a discussion of serious physical harm, or the substantial risk thereof, as related to strangulation. For ease of argument, we will address the second assignment of error first. If this Court finds the evidence supports appellant's conviction for strangulation, the conviction for endangering children under R.C. 2919.22(E)(2)(c), elevating the offense to a third-degree felony, will necessarily stand as well.

{¶27} Most of appellant's brief is spent discussing inconsistencies in testimony, such that the trial court resolved conflicting accounts improperly and had no basis to find that appellant created a substantial risk of serious physical harm by strangling A.M. We disagree. This court will not reverse the convictions based on insufficiency ground **or** manifest weight grounds when the record contains substantial evidence to support the trial court's resolution of the testimony.

{¶28} R.C. 2903.18(B)(2) provides "(B) No person shall knowingly do any of the following: * * * (2) Create a substantial risk of serious physical harm to another by means of strangulation or suffocation." R.C. 2901.01 defines serious physical harm and provides, in relevant part:

(A)(5) "Serious physical harm to persons" means any of the following:

* * *

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity.

(A)(8) "Substantial risk" means a strong possibility * * * that a certain result may occur or that certain circumstances may exist.

{¶29} Recently, this Court noted that the degree of harm that rises to the level of "serious" is not a precise science, especially since the statute utilizes descriptors such as "substantial," "temporary," "acute," and "prolonged." *State v. Williams*, 2024-Ohio-5578, ¶¶ 51-52, citing *State v. Irwin*, 2007-Ohio-4996, ¶ 37 (7th Dist.). Moreover, whether physical injuries constitute serious physical harm is typically a question of the weight rather than the sufficiency of the evidence. *Id.*, *citing State v. Salemi*, 8th Dist. No. 81091, 2002-Ohio-7064, ¶ 34. Asphyxiation, a loss of consciousness from the inability to breathe, constitutes serious physical harm. *State v. Church*, 2012-Ohio-3877, ¶ 18.

{¶30} Appellant claims that because A.M. did not seek immediate medical attention, she was not seriously harmed. A.M. is a minor child, and the circumstances surrounding the incident were, at the very least, chaotic. The very person A.M. would have relied upon to take her to a doctor was the same person who "beat her ass" and the day before attempted to surrender custody of her to the agency. Moreover, A.M. informed Kuntz in detail that appellant grabbed her by the throat, pushed her into a wall, and she suffered various symptoms as a result. Kuntz noticed red marks on her neck.

This conversation occurred around 1:00 p.m. on December 28, 2023, less than 24 hours after the incident. Immediately thereafter, A.M. had to pack a bag and leave her home.

**{¶31}** Approximately two weeks later, A.M. was interviewed and examined at Brave Beginnings by two experienced and qualified individuals who deal with children on a regular basis – Nurse McClelland and forensic examiner Kuhn. Appellant attempts to discredit Nurse McClelland and Kuhn's testimony because when they examined A.M. on January 11, 2024, the marks, cuts, puffy face, hoarse voice and bruises were not readily apparent. However, just because the same were not visible on January 11, does not mean they were not inflicted on December 27. Indeed, on December 28, 2023, **appellant herself** stated to Kuntz that she beat A.M.'s ass the night before, or words to that effect, one version stated, "I put my fucking hands on her last night, are you gonna take her with you now." Two pictures show the red marks, particularly State's Exhibit 33.

**{¶32}** Appellant further claims that A.M.'s account of the incident should not be believed because she failed to describe the near loss of consciousness in her first two accounts to Ms. Kuhn but then did so in her third account. Ms. Kuhn explained on the record that she uses a technique to help victims refresh their recollection and asks the same question at least 3 times to get a clear picture of what happened. That A.M. told Ms. Kuhn during the third round did not surprise her. Trial Transcript Page 84, line 13-14. Defense counsel asked "And that is typical in an interview? Ms. Kuhn replied "sure."

**{¶33}** Viewing the evidence in a light most favorable to the prosecution, we conclude that based on the medical records and testimony, a *reasonable person* (a trial judge) could have found beyond a reasonable doubt that appellant did create a substantial risk – a strong possibility - of serious physical harm to A.M. by means of

strangulation. Strangulation, by its very nature, includes a risk of death. Nurse McClelland and Forensic Examiner Kuhn have years of expertise, and both conveyed that appellant caused serious injuries to A.M. by strangulation - just 10 seconds can render a person unconscious. Nurse McClelland testified that strangulation is very serious because people can die from it "quickly." The fact that appellant does not think what she did was so serious is quite simply, irrelevant.

**{¶34}** Regarding "weight" of the evidence, appellant argues that A.M.'s inconsistencies when first reporting the incidents renders her account unreliable. However, when there is conflicting trial testimony, a defendant is not automatically entitled to a reversal on manifest weight grounds. Rather, the court must determine that the trier of fact "clearly lost its way" when resolving the conflicting evidence. Here, the trial court did not clearly lose its way in resolving the conflicting evidence in the State's favor and finding that appellant caused serious physical harm to A.M. by strangulation. Appellant would have this Court believe that A.M.'s "unruly behavior" at age 14 somehow justifies appellant's actions. It does not.

**{¶35}** The transcript makes clear that appellant's demeanor at trial was much more subdued than her demeanor in the encounters at issue. Indeed, Kuntz's initial interaction with appellant at the agency involved appellant yelling at A.M. to such a degree that Kuntz demanded she stop. Appellant admitted to Kuntz and Detective Archer that she beat A.M.'s ass but then testified at trial that she only grabbed her shirt – thereby accidentally grabbing her hair - and put A.M. in a corner in her room. The trial court could easily find that it was appellant who was not being truthful about the details of what happened that night. **Thus, appellant's second assignment of error is overruled**.

**{¶36}** In the first assignment of error, appellant makes the related argument that the trial court's convictions based on a finding of serious physical harm, or the substantial risk thereof, was against the sufficiency of the evidence as well as the manifest weight of the evidence. However, based on the reasons set forth above, finding the elements of strangulation clearly have been met in this case, to include creating a substantial risk of physical harm, **appellant's first assignment fails and is overruled.**

## CONCLUSION

**{¶37}** For the reasons set forth above, the Court overrules appellant's first and second assignments of error and AFFIRMS the judgment of the trial court in all respects.

By: Montgomery, J.

Popham, J. and

Gormley, J. concur.